IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| NICOLE MURRAY, | ) | Case No. 1:16-cv-2129 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

## I.     Introduction

Plaintiff Nicole Murray seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act.  This matter is before the court pursuant to 42 U.S.C. §1383(c)(3), 42 U.S.C. §405(g), and Local Rule 72.2(b).

Because the Commissioner supported the decision in this case with substantial evidence and made no error in the application of law, I recommend that the final decision of the Commissioner be **AFFIRMED**.

## II.     Procedural History

Murray applied for DIB and SSI on May 7, 2013, alleging a disability onset date of August 27, 2011.  (Tr. 64-65, 183, 190)  Murray alleged disability based on "cervical degenerative disc herniation, herniated disc, chronic back pain in lumbar spine, depression, and

anxiety." (Tr. 207)  Murray's applications were denied initially and upon reconsideration.  (Tr. 122, 126, 132, 135)  Thereafter, Administrative Law Judge George Roscoe ("ALJ") conducted a hearing on July 1, 2015.  (Tr. 34-58)  On July 28, 2015, the ALJ denied Murray's claim.  (Tr. 16-33)  The Appeals Council denied review of that decision on July 26, 2016, rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1-4)

## III.    Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(a).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[1]….

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

---

[1] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 423 (d)(2)(A).

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert,* 482 U.S. 137, 140-142 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.* 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform work available in the national economy. Id.

## IV. The ALJ's Decision

The ALJ issued a decision on April 1, 2015. A summary of his findings are as follows:

1. Murray meets the insured status requirements of the Social Security Act through December 31, 2016. (Tr. 21)

2. Murray has not engaged in substantial gainful activity since April 27, 2011, the alleged onset date. (Tr. 21)

3. Murray has the following severe impairments: degenerative disc disease of the cervical spine with chronic pain syndrome; major depressive disorder; panic disorder without agoraphobia; history of learning disorder; and history of headaches. (Tr. 22)

4. Murray does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. (Tr. 22)

5. Murray has the residual functional capacity ("RFC") to perform light work

except she can climb ladders ropes of (sic) scaffolds; can perform occasional climbing of ramps and stairs, balancing, stooping, kneeling, and crouching; occasional reach overhead with unlimited lateral reaching; cannot be exposed to hazards (heights, machinery, commercial driving); and mentally, the claimant can perform simple, routine tasks in a low stress environment (i.e., no fast pace, strict quotas, or frequent duty changes) with superficial interactions with coworkers co-workers (sic) and supervisors, and no interaction with the general public as a job requirement. (Tr. 24)

6. Murray is unable to perform any past relevant work. (Tr. 26)

7. Murray was born on November 11, 1979, and was 31 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. (Tr. 27)

8. Murray has at least a high school education and is able to communicate in English. (Tr. 27)

9. Considering Murray's age, education, and work experience, and RFC, there are jobs that exist in significant numbers in the national economy that the claimant can perform. (Tr. 27)

Based on these findings, the ALJ determined that Murray had not been under a disability from August 27, 2011, through the date of the decision. (Tr. 28)

Murray challenges this decision, claiming that the ALJ mis-handled the opinions of her treating sources, and did not properly consider the opinions of an examining non-treating source. She also contends that remand is warranted in light of the information she submitted after the hearing. The Commissioner argues that the ALJ's handling of the opinion evidence was adequate and contends the additional evidence is not enough to require a remand.

## IV.    Evidence

### A.    Personal, Educational, and Vocational Evidence

Murray was 35 years old at the time of the ALJ's decision. (Tr. 183) She had a high school education. (Tr. 208) From May 2007 through August 2011, she worked as a patient transporter in a hospital. (Tr. 209) Murray alleged that she injured her neck in a work related

injury on March 2011.  (Tr. 400)  She worked a seasonal job as a cashier in December 2013.  (Tr. 573)

**B.      Medical Evidence pertaining to Neck and Back Impairments**

A cervical MRI performed on June 3, 2011 showed that Murray had a moderate herniated disc at C5 - 6 with cord compression but without myelomalacia.  (Tr. 423)  On September 29, 2011, Murray arrived at the emergency room complaining of neck and back pain, sensitivity to light, and tinnitus.  (Tr. 269-72)  On examination, Murray was able to extend and flex her neck, she had tenderness over the spinal muscles along her back, she had full motor strength in her extremities, and she was neurologically intact.  (Tr. 271)  Staff diagnosed Murray with acute exacerbation of chronic neck and back pain and discharged her home in stable condition.  (Tr. 272)

On January 16, 2012, Murray began treating with Daniel Malkamaki, M.D., in the MetroHealth department of Physical Medicine and Rehabilitation.  (Tr. 400)  Murray complained of daily intermittent back pain and stated that she had problems sitting and standing.  (Tr. 400-01)  Murray reported that a University Hospital physician had advised that she might need surgery.  (Id.)  However, Dr. Malkamaki told her that "was not what a conservative surgeon would have ever said."  (Id.)  Dr. Malkamaki also noted that Murray was a "very poor historian, as she keeps going back and forth with the low back and leg portions of this, when it happened, did they happen together, etc., and there is no consistency."  (Tr. 401-02)  Dr. Malkamaki reported that Murray was dealing with some stressors because she lost her bureau of worker's compensation case and her job.  (Tr. 402)  However, Murray indicated that she had been looking into schooling to get into another line of work.  (Id.)

On examination, Murray exhibited neck tenderness on the left, full shoulder range of motion, normal muscle strength, normal sensation, and her cervical range of motion was "within functional limits." (Tr. 40) Dr. Malkamaki diagnosed cervical discogenic pain syndrome, cervical myofascial pain syndrome, and lumbar discogenic pain syndrome. (Tr. 403) He recommended the R.I.C.E protocol (relative rest, ice, compression, and elevation), as well as over-the-counter non-steroid anti-inflammatory drugs ("NSAIDs"), and a home exercise program. (Tr. 402) Murray agreed with the conservative treatment plan. (Id.)

Less than two weeks later, on January 28, 2012, Murray presented to the emergency room complaining of neck and back pain. (Tr. 392-99) Treatment notes state that no emergency medical condition had been identified and it was recommended that Murray continue the plan of care as outlined by the rehabilitation clinic. (Tr. 394)

On April 15, 2012, Murray began treating with Karen Kea, M.D. (Tr. 386-91) She complained of left-sided heaviness in her face and arm. (Tr. 386) Murray reported going to the emergency department the prior week with similar complaints, as well as slurred speech. (Tr. 386) A CT scan identified no intracranial abnormalities. (Tr. 391) On examination, Murray had 5-/5+ strength in all extremities and normal sensation (Tr. 387). Murray returned to Dr. Kea on May 20, 2012, to review lab results. (Tr. 380) She continued to complain of head and neck pain. (Id.)

A June 30, 2012, MRI of Murray's cervical spine showed "minimal spondylotic[2] changes." (Tr. 425). Fredrick Wilson, D.O., examined Ms. Murray on July 19, 2012. (Tr. 421-23). Dr. Wilson found normal strength and reflexes with limited flexion and muscle tension.

---

[2] "Cervical spondylosis is a general term for age-related wear and tear affecting the spinal disks in your neck." http://www.mayoclinic.org/diseases-conditions/cervical-spondylosis/basics/definition/con-20027408 (last visited May 30, 2017)

(Tr. 422-23)  It was also noted that she had "unsustained clonus"[3] in the ankle and Hoffman's bilateral.[4]  (Id.)

A spinal consultation was performed by Erin Anderson, a physician's assistant, on July 27, 2012.  (Tr. 358-62)  Murray complained of neck pain radiating to her left bicep and fingers.  (Tr. 358)  Upon examination, Murray's motor testing and reflexes were normal.  (Tr. 360)  She exhibited no Hoffman's or clonus.  (Tr. 360)  However, she exhibited Lhermitte's sign.[5]  Ms. Anderson opined that Murray had the beginning symptoms of myelopathy and recommended an MRI.  (Tr. 361)

An August 10, 2012, MRI showed degenerative changes, "most notably at C5-6 with an eccentric disk osteophyte complex on the left causing mild thecal sac compression without significant spinal cord compression."  (Tr. 363)

On October 3, 2012, Murray returned to Dr. Kea complaining of ongoing headache, neck pain, tingles, and numbness.  (Tr. 350)  Murray reported being stressed and stated that she might have to drop out of school due to problems concentrating.  (Id.)  Dr. Kea requested psychiatric services for Murray and advised her to return in May 2013 for a physical.  (Tr. 353)  There was no new assessment/plan listed for dealing with Murray's headaches or cervical discogenic pain syndrome.  (Tr. 350-51)

---

[3] "Clonus is a rhythmic series of contractions evoked by a sudden stretch of the muscles.  Unsustained clonus can occur in healthy individuals.  When sustained, it indicates upper motor neuron damage and is accompanied by spasticity."  Macleod, John, Macleod's Clinical Examination, 12th Edition, Pg. 288. https://books.google.com/books?id=WMArUmBsEgC&pg=PA288&lpg=PA288&dq=unsustained+clonus &source=bl&ots=AkO_uelrEP&sig=eHLCfylANJ6Ooi333ot9TTd17k&hl=en&sa=X&sqi=2&ved=0ahU KEwjIhfPWhvfTAhVO2mMKHaw4AswQ6AEIiQEwEg#v=twopage&q=unsustained%20clonus&f=fals e (Last visited May 30, 2017)
[4] "Hoffman's syndrome is a specific, rare form of hypothyroid myopathy, which causes proximal weakness and pseudohypertrophy of muscles." https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4173264/ (last visited May 30, 2017)
[5] "Lhermitte's sign…describes an electric shock-like sensation that occurs on flexion of the neck." https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4445188/ (last visited May 30, 2017).

On November 27, 2012, Murray returned to see Dr. Malkamaki after an eleven-month absence. (Tr. 345-49) Dr. Malkamaki opined that Murray would "be best served by trial of continued home exercises." (Tr. 347) Murray expressed her interest in injections. (Id.) Dr. Malkamaki ultimately determined to add up to 3 steroid injections to the treatment plan. (Id.) On March 28, 2013, she received a steroid injunction in the C7-T1 space. (Tr. 341)

The next month Murray returned to Dr. Kea due to left side headache with numbness and tingling in the left hand. (Tr. 334) Dr. Kea referred Murray for a neurological evaluation. (Id.)

In May 2013, an EMG returned normal results. (Tr. 332) On August 3, 2013, Murray was seen at MetroHealth for left arm and cervical disk pain. (Tr. 485). She was referred back to Dr. Malkamaki and recommended to use a daily NSAID. (Tr. 487)

Murray returned to Dr. Malkamaki on October 3, 2013. (Tr. 475) Another steroid injection was given in the C7-T1 space. (Id.)

On April 25, 2014, Dr. Kea reported that Murray complained of the following:

applying for disability
freq lifting 5# hurts L side of neck/shoulder

family member assists her with groceries
no problem with walking
standing more than 15 mins causes soreness in neck radiating down back to waist
can sit for about 30-45 mins at a time
difficulty with bending, crawling and stooping
sensitive to cold
no ladders

(Tr. 713) Murray presented to the emergency room on August 21, 2014, and September 15, 2014, complaining of increased pain. (Tr. 786-87, 791) Treatment notes indicated that no labs or imaging tests were needed. (Id.) Moreover, no emergency medical condition had been identified. (Id.) On September 15, 2014, Murray also returned to Dr. Kea. Dr. Kea made the following notations:

>    neck pain
>    at Connections for depression
>    needing referrals
>    conts to have urine freq
>    applying for disability at least temporarily
>    unable to stand for longer than 10-20 mins; total 1-2 hrs/8 hr period.
>    walking is less painful
>    able to sit 30-60 mins; 2-4 hrs/8 hrs

(Tr. 778)[6]  That same day Murray presented to the emergency room complaining of neck and

back pain.  (Tr. 791)  Treatment notes indicated that no labs or imaging tests were needed.  (Id.)

Moreover, no emergency medical condition had been identified and the reviewer opined that it

was "[c]linically suspicious for typical flare of patients cervical neuralgia."  (Id.)

Several days earlier, Murray had seen Dr. Malkamaki who reiterated that Murray should

continue home exercises and repeat injection if pain increases.  (Tr. 819)  The next month

(November 2014), Murray returned to Dr. Malkamaki reporting a worsening of her neck pain but

could not explain what happened to make her worse beside cold weather.  (Tr. 832)  Dr.

Malkamaki stated that he would not consider additional injections until "she becomes a better

'passive treatment responder' by engaging in rehab."  (Id.)  Dr. Malkamaki again recommended

adhering to a home exercise program.  (Tr. 836-37)  She followed up with Dr. Malkamaki in

January 2015, again complaining of increased neck pain.  (Tr. 840)  She thought the increase in

neck pain was caused by the weather or a fall in December.  (Id.)  Dr. Malkamaki again

recommended continued home exercises.  (Tr. 844-45)

On February 3, 2015, Oluwatoyin Opelami, M.D., referred Murray to the Cleveland

Clinic Fibromyalgia clinic advising that she could benefit "from a comprehensive

---

[6] It is unclear whether the information in the September 2014 list came directly from Murray or from Dr. Kea.  (Id.)   However, based on the content (i.e., "needing referrals…applying for disability at least temporarily.") and when read in context with the April 2014 notations, the list appears to be derived, at least in part, from Murray's self-reporting.

multidisciplinary approach of care including psychiatry, physical therapy and pain management."

(Tr. 851)  On May 19, 2015, she reported to a MetroHealth doctor that she had been diagnosed

with fibromyalgia by a rheumatologist at the Cleveland Clinic and had joined a fibromyalgia

support group.  (Tr. 935)  At that time, she reported that she ran out of her medication and her

pain was so severe she could not tolerate a blood pressure cuff or examination.  (Id.)

      **C.**      **Medical evidence pertaining to mental health**

On November 22, 2011, Murray received emergency care after a failed suicide attempt

following her ingestion of 10 to 20 Ambien.  (Tr. 274)  Murray reported feeling depressed after a

fight with her mother about being laid off from work and her inability to find a job.  (Tr. 299)

She also complained of neck pain and her concern that she could not get neck surgery due to

financial issues.  (Id.)  She denied any previous suicide attempts.  (Id.)  Staff diagnosed Murray

with adjustment disorder with depressed mood and learning disability.  (Id.)  She was started on

Zoloft.  (Id.)  Staff discharged Murray to a psychiatric hospital where she stayed until November

30, 2011.  (Tr. 282, 299)

Upon discharge, Murray treated at the Free Clinic and continued to be prescribed Zoloft.

(Tr. 305-16)  It was noted that she would follow up with MetroHealth for treatment of her

depression.  (Tr. 308, 316)

On July 16, 2012, at a physical therapy appointment for Murray's back and neck pain, the

therapist noted that Murray provided unusual responses to questions, had difficulty with her

short-term memory and staying on tasks.  (Tr. 366)  Some exercises were deferred due to a short

duration "choking" sensation, but no complaints were noted after the exercises stopped.  (Id.)

The physical therapist contacted Murray's physician due to the behavior described herein.  (Id.)

In December 2013, Murray received counseling at Connections with Sarah Nagle-Yang, M.D.  (Tr. 573-75)  Murray complained of depression and anxiety.  (Tr. 573)  Dr. Nagle-Yang's notes indicate that Murray had been receiving counseling prior but her case was closed on February 2nd due to "lack of engagement."  (Tr. 573)  At that time, Murray reported working a seasonal job as a cashier.  (Id.)  Dr. Nagle-Yang reported that Murray had been inconsistent with medical administration in the past.  (Tr. 574)  She prescribed new medication and recommended psychoeducation.  (Id.)

On March 6, 2013, Murray arrived to the emergency department stating that she took 7 oxycodone tablets in an attempt to end her life.  (Tr. 428-29, 432)

Psychiatric evaluations, performed on March 26, 2013 and June 21, 2013, resulted in a diagnosis of recurrent depressive psychosis, moderate.  (Tr. 451-54, 467)  It was also noted that Murray was fully oriented with a logical thought process.  (Tr. 452-59)  On September 12, 2013, Murray expressed homicidal and suicidal ideation (Tr. 560). At that time, Murray reported not taking her medication because she did not like it.  (Id.)  Connection patient notes, dated October 17, 2013, reported that Murray was depressed, frustrated, angry, anxious, and had poor eye contact (Tr. 548) Murray expressed that if someone were to put their hands on her without her consent, they would die.  On January 23, 2014, Murray went to Connections and complained of negative ruminations, frequent tearfulness, and irritability.  (Tr. 576)

In January 2014, Murray continued to report depressive symptoms.  (Tr. 576-78)  In February 2014, Murray reported continued depression with negative ruminations, frequent tearfulness, and irritability.  (Tr. 579)  Murray reportedly stopped taking her medication because she did not "feel like it."  (Id.)  At the time of the visit, Murray restarted the medication.  (Id.)

On February 6, 2014, while at Dr. Kea's office, Murray was found lying on the floor in a fetal position. (Tr. 625). She reported feeling lightheaded and not well for the prior two weeks. (Id.). She asked for a "death pill" but denied a plan to kill herself. (Id.) Murray was then referred to the emergency department for evaluation of her suicidal ideation, where she was diagnosed with depression. (Tr. 631-33).

In March 2014, Murray reported continuing depression. (Tr. 581) Dr. Nagle-Yang noted that medication compliance appeared to be "sporadic." (Id.) Dr. Nagle-Yang opined that in addition to depression, Murray likely suffered from impaired social interaction. (Tr. 582) She stated that in counseling, Murray showed a significant deficit in her ability to form connections with others or view situations from others point of view. (Id.) Dr. Nagle-Yang opined that Murray's diagnosis might include a Schizotypal Personality Disorder or Autism Spectrum Disorder. (Id.)

In April 2014, Murray reported that she had continued depression with sleep disturbances. (Tr. 583). The next month, Murray reported her sleep and "restlessness" had improved on Seroquel, but stated that she did not take it consistently due to side effects. (Tr. 599) Dr. Nagle-Yang discussed the possibility of neurotesting to better delineate diagnosis (Schizotypal Personality Disorder vs. Autism Spectrum) but Murray declined and stated she would discuss again at another time. (Id.)

In June 2014, Murray reported increased anxiety due to insurance issues that had been resolved at the time of her appointment. (Tr. 597) Her mood was down/constricted but she behaved cooperatively and demonstrated intact cognition and fair insight/judgment. (Id.) In July 2014, Murray reported, "doing well overall" but had some anxiety regarding her finances. (Tr.

595) Murray reported looking for part-time work without success. (Id.) She stated that with medication her recent weeks had not been too overwhelming. (Id.)

In August 2014, Murray presented as happy on several occasions, although she reported some stress due to issues with benefits. (Tr. 872, 922-28) In September 2014, Murray was often noted to be in a good mood. (Tr. 910, 914, 917, 919) However, on September 9, 2014, she reported being at a "10" for both emotional and physical pain. (Tr. 869) Murray decided to go to Magnolia Clubhouse for group therapy. (Tr. 919) In October 2014, Murray was in a positive mood but reported anxiety due to taking the bus. (Tr. 900) Murray expressed that she would like to be better at refilling prescriptions on time and maintaining appointments. (Id.) In November 2014, Murray presented with a positive mood, but became frustrated with a benefits application. (Tr. 897) She had discontinued taking one of her medications because she did not like the way it made her feel. (Tr. 866) In December 2014, Murray appeared tired and reported recovering from an illness. (Tr. 890) She reported medication compliance and looking for work. (Id.) She received a call regarding a phone interview. (Id.) She stated that she was unsure whether the job would be acceptable, but determined to go to the interview. (Id.)

In January 2015, Murray reported feeling "ok" emotionally but physically unwell. (Tr. 864, 888) She reported that she enjoyed learning editing at the Magnolia Clubhouse and expressed a desire to return to her old job. (Tr. 874) In February 2015, Murray presented in a positive mood, active, energetic, and talkative. (Tr. 886) She had actively been searching for jobs and had two interviews scheduled for the following week. (Id.) She reported that she was hesitant to take a job paying minimum wage. (Id.) In March 2015, Murray reported that she had high anxiety, sleep disturbances, and serious concerns over her finances. (Tr. 883) She reported taking her medications the majority of time but noted times of missing and skipping them. (Id.,

862)  She stated that she was edgy due to nerve pain.  (Id.)  She had been attending Magnolia

Clubhouse twice weekly and had become the head of editing video for their media lab.  (Id.)  In

April 2015, Murray expressed feelings of helplessness, social isolation, loss of interest in

attending Magnolia Clubhouse, and annoyance.  (Tr. 878-81)  She expressed frustration about

not being able to receive financial assistance.  (Id.)

>    **D.    Opinion Evidence**

>        **1.    Treating Physician – Dr. Kea**

On May 2, 2014, Dr. Kea completed a medical sources statement ("MSS") on Murray's

behalf utilizing a check-box form.  (Tr. 592-93)  Dr. Kea restricted Murray to lifting and carrying

5 pounds occasionally and less than 5 pounds frequently due to pain in her left neck and

shoulder.  (Tr. 592)  She opined that Murray could stand/walk for less than 1 hour, [7] could sit for

2-3 hours, could occasionally reach, pull, push, crouch, kneel, and balance.  (Tr. 592-93)  She

noted that Murray did not use any assistive devises but needed a sit/stand option with extra break

periods in the day.  (Tr. 593)  Finally, she stated that Murray's pain interfered with concentration

and caused absenteeism.  (Id.)

On July 30, 2014, Dr. Kea drafted a letter opining that Murray's medical problems

(cervical discogenic pain syndrome, cervical myofascial pain syndrome, lumbar discogenic pain

syndrome, and major depression) "prevent[ed] her from maintaining gainful employment."  (Tr.

594)

---

[7] Dr. Kea also stated that Murray "can walk (illegible) problem."  (Tr. 592)  It is unclear what is meant by
this notation.

### 2. Treating Physician – Dr. Nagle-Yang

Dr. Nagle-Yang completed a medical source statement ("MSS") on April 21, 2014 utilizing a check box form. (Tr. 571-72) Dr. Nagle-Yang indicated, among other things, that Murray could rarely interact with others and could not deal with work stress or complete a normal workday without psychological symptom interruption. (Tr. 571) Dr. Nagle-Yang indicated that Murray's diagnoses of Major Depressive Disorder and Schizotypal Personality Disorder supported her assessment. (Tr. 572)

### 3. Consultative Examination – Dr. House

Murray underwent a consultative examination by David House, Ph.D., on June 21, 2012. (Tr. 318-26). Murray reported taking Zoloft prescribed by Dr. Kea. (Tr. 320) At that time, Murray reported that she had not received mental health counseling. (Id.) Dr. House opined that Murray had moderate difficulties with concentration and attention. (Tr. 325-26) He further opined that due to Murray's frequent panic attacks, stress response, and limited coping skills she would likely "be dysfunctional in a work environment and would probably not show up to work." (Tr. 326) He diagnosed major depression, moderate, recurrent, and panic disorder without agoraphobia. (Id.) Dr. House noted that those conditions appeared chronic. (Tr. 325) He concluded by stating that Murray's "prognosis is fair" and that "[s]he does receive treatment that can be adjusted if necessary." (Tr. 327)

### 4. State Agency Consultants

Cynthia Waggoner, Psy.D., reviewed Ms. Murray's file on July 25, 2013. (Tr. 74-76) She concluded that Murray could adapt to infrequent changes in a relative static work environment, could complete short cycle work tasks that did not require adherence to strict time or production demands, and that she retained the ability to interact on a superficial level with

coworkers and supervisors, but does not have the patience for service with the public. (Id.)

Tonnie Hoyle, Psy.D., considered the record on November 13, 2013, and identified the same

mental restrictions as Dr. Waggoner. (Tr. 104 - 105).

On July 30, 2013, Diane Manos, M.D. reviewed Murray's file and found the following

physical restrictions: Murray could lift and carry 10 pounds frequently and 20 pounds

occasionally, sit and stand/walk for six hours out of an eight-hour day; and only occasionally

climb ladders, ropes, or scaffolds. (Tr. 72-74) On December 6, 2013, Anne Prosperi, D.O.,

reviewed Murray's evidence and affirmed Dr. Manos' findings, except for Dr. Prosperi found

Murray limited to occasionally bilateral overhead reaching and occasional crawling. (Tr. 100-

03)

### E.    Testimonial Evidence[8]

Murray testified that she lived on her own in a two-bedroom subsidized apartment. (Tr.

38-39, 48) She did not hold a driver's license. (Id.) She testified that she had problems

sleeping. (Tr. 48) She further testified that she managed her own personal care, cooked,

completed housework, shopped, watched television, used the computer, and attended Magnolia

Clubhouse (a social club for people with physical and mental disabilities) a couple times a week.

(Tr. 46, 48-49) She also stated that she visited with family about two times a month. (Tr. 51)

However, she stated that most of her days were spent lying in bed. (Tr. 49) She also testified

that she had problems with crowds of people. (Tr. 46-47)

Murray contended that her back and neck pain kept her from working. (Tr. 40) She

stated that she took Lyrica for her pain and that it helped "sometimes." (Tr. 41) She also stated

---

[8] Vocational Expert Mark Anderson also testified at the hearing, identifying numerous jobs someone with plaintiff's characteristics could perform. (Tr. 52-55) However, because Murray's challenge does not relate to Mr. Anderson's testimony, the testimony will not be summarized herein.

that she had participated in pool therapy in the past. (Id.) She testified that she did not use an assistive device, had not had back surgery, but had received injections in her back. (Tr. 42)

Murray testified that she previously worked as a patient transporter but was laid off by her employer in 2011. (Tr. 39-40, 43) She stated that she was denied worker's compensation, but did obtain unemployment benefits. (Tr. 43) She testified that she did not know how long she could walk or stand. (Tr. 44) She also stated she was unable to pick up a gallon of milk because it was too heavy. (Id.)

Murray stated that she had seen Dr. Nagle once every three months for mental health issues. (Tr. 45) She stated that she was referred to Dr. Nagle after Murray's suicide attempts. (Tr. 51) She stated that she had treated with Dr. Nagle for the two years prior and Dr. Nagle prescribed medication. (Tr. 46)

**VI.    Law & Analysis**

**A.    Standard of Review**

This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker,* 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994).

The Act provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §§ 405(g) and 1383(c)(3). The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter,* 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen,* 800 F.2d 535,545 (6th Cir. 1986); *see also Her v. Comm'r of Soc. Sec.,* 203 F.3d 288, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached." *See Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen,* 800 F.2d at 545 (*citing Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir. 1984).

The court must also determine whether proper legal standards were applied. If the Commissioner does not apply the correct legal standards, reversal is required, unless the error is harmless. *See e.g. White v. Comm'r of Soc. Sec.* 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [when] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); *accord Shrader v. Astrue,* No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich.

Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-cv-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).

### B.    Plaintiff's Claims of Error

Murray presents three arguments for review.  First, Murray contends that the ALJ failed to give controlling weight to the opinions of her treating physician and treating psychiatrist and failed to provide good reasons for having chosen not to.  ECF Doc. No. 12, Page ID# 1041-49. Second, Murray argues that the ALJ improperly assessed the opinions of the consulting examiner.  Id. at 1049-50.  Third, Murray offers that new and material evidence warrants a remand.  Id. at 1051-53.

### 1.    Treating Sources

Murray argues that the ALJ failed to provide good reasons for discounting the medical source opinions of her treating physician, Karen Kea M.D., and her treating psychiatrist, Sarah Nagle-Yang, Ph.D.  Id. at 1041-49.

Dr. Nagle-Yang completed a medical source statement ("MSS") on April 21, 2014.  (Tr. 571-72)  The MSS was in checkbox form.  Dr. Nagle-Yang checked boxes indicating, among other things, that Murray could rarely interact with others and could not deal with work stress or complete a normal workday without psychological symptom interruption.  (Tr. 571)  Dr. Nagle-Yang indicated that Murray's diagnoses of Major Depressive Disorder and Schizotypal Personality Disorder supported her assessment.  (Tr. 572)

Dr. Kea completed a MSS on May 2, 2014. (Tr. 592-93) Dr. Kea's MSS noted several physical restrictions; including that Murray could only occasionally lift 5 pounds due to pain in her neck and shoulder. (Tr. 592) She also opined that Murray could only sit for 2-3 hours in an 8-hour workday and could not stand without interruption for even 1 hour. (Id.) She further found that Murray could rarely climb, stoop, or crawl and could only occasionally balance, crouch, kneel, reach, push/pull. (Tr. 592-93) The ALJ rejected both opinions stating the following:

> Form reports where a provider's obligation is only to check a box or fill in a blank are rather weak evidence, especially when they are not accompanied by detailed explanations. Moreover, the other evidence does not support this degree of limitation.

(Tr. 26) Murray argues that the ALJ's explanation does not constitute "good reasons" for rejecting the opinions. ECF Doc. No. 12, Page ID# 1041.

Social Security Administration regulations dictate how medical opinions must be weighed. 20 C.F.R. § 416.927(c). In general, the regulations provide greater deference for a treating physician over an examining physician and greater deference to an examining physician over a non-examining physician. Id.; *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013). In fact, if treating source opinions are (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "not inconsistent with the other substantial evidence in [the] case record," then they must receive "controlling" weight. 20 C.F.R. §416.927(c)(2); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 286 (6th Cir. 2009).

If the treating source opinion is not given controlling weight, then the ALJ must use several factors to determine the weight to give the opinion including: the length, frequency, nature, and extent of the treatment relationship; supportability; consistency; specialization; and other factors which support or contradict the opinion. 20 C.F.R. § 416.927(c). These reasons

must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Gayheart,* 710 F.3d at 376 (quoting SSR 96–2p, 1996 WL 374188 at *5 (SSA)).

"The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 544–45 (6th Cir. 2004) (citing *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir.1999)) (internal quotations omitted). Because the reason-giving requirement exists to "ensur[e] that each denied claimant receives fair process," the Sixth Circuit has held that an ALJ's "failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight" given "*denotes a lack of substantial evidence,* even where the conclusion of the ALJ may be justified based upon the record." *Id.* (quoting *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 243 (6th Cir.2007) (emphasis added)). Here, the ALJ provided that the opinions of Drs. Kea and Nagle-Yang were not properly supported and were inconsistent with other evidence. As explained more fully below, although the ALJ stated only terse reasons for rejecting the treating source opinions, the ALJ satisfied the good reasons requirement by providing clear reasons, supported by the record.

The Sixth Circuit is in agreement with several other circuits in finding that an ALJ "may properly give little weight to a treating physician's check-off form of functional limitations that did not cite clinical test results, observations, or other objective findings...." *Ellars v. Comm'r of*

*Soc. Sec.,* 647 F. App'x 563, 566–67 (6th Cir. 2016) *quoting Teague v. Astrue,* 638 F.3d 611, 616

(8th Cir.2011)(internal quotations omitted); *Kepke v. Comm'r of Soc. Sec.,* 636 F. App'x 625, 630

(6th Cir. 2016)(Noting that "checklist opinions are not *per se* unreliable" but finding that an ALJ

can properly discount the opinions on the ground that the doctor failed to provide an explanation

for his findings); *See also Hoyt v. Colvin*, 607 F. App'x 692 (9th Cir. 2015) (finding that the ALJ

did not err in discounting the opinion of the treating physician because it was based on a "check-

box forms…predicated on the self-reporting of [claimant], who the ALJ determined was not

credible."); *Eskew v. Astrue,* 462 Fed. App'x 613, 616 (7th Cir.2011) (Discounting medical

opinions in "check-box form"); *Mason v.* Shalala, 944 F.2d 1058, 1065 (3d Cir. 1993) ("Form

reports in which a physician's obligation is only to check a box or fill in a blank are weak

evidence at best.").  Social security regulations also provide that, "The more a medical source

presents relevant evidence to support an opinion, particularly medical signs and laboratory

findings, the more weight we will give that opinion.  The better an explanation a source provides

for an opinion, the more weight we will give that opinion."  20 C.F.R. § 404.1527.  Thus, the

ALJ was well within his discretion to reject Dr. Kea and Dr. Nagle-Yang's check-box opinions

because they did not express the bases for their conclusions.[9]

      However, the ALJ did not only reject the opinions of Drs. Kea and Nagle-Yang for

failing to provide a base for their conclusions.  The ALJ also stated that the degree of limitations

imposed by the doctors was inconsistent with other evidence in the record.  Looking at the

opinion as a whole, substantial evidence supports the ALJ's determination.

---

[9] Dr. Kea provided only that pain in Murray's left neck and shoulder supporting a lifting limitation.  (Tr. 592)  She did not provide any other additional information in support of her findings.  Other than putting checks in boxes, Dr. Nagle-Yang listed only Murray's diagnoses of Major Depressive Disorder and Schizotypal Personality Disorder on her MSS form.  (Tr. 572)  These few statements do not provide a basis for the extreme limitations provided in either MSS.

As to the psychological opinion, Murray states that the Connections records provide supportability to Dr. Nagle-Yang's opinion. ECF Doc. No. 12, Page ID# 1048. She asserts that the ALJ ignored these treatment notes. Id. Murray is incorrect. The ALJ's decision references therapists' notes from Connections. (Tr. 26) Thus, it is clear that these records were considered. Furthermore, although an ALJ is required to consider all relevant evidence, the ALJ need not reference every piece of evidence considered. *See Simons v. Barnhart,* 114 Fed. Appx. 727, 733 (6th Cir.2004) (quoting *Craig v. Apfel,* 212 F.3d 433, 436 (8th Cir.2000)) ("Although required to develop the record fully and fairly, an ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered.")

In support of her argument that Dr. Nagle-Yang's opinion was improperly discounted, Murray points only to one treatment note (a March 24, 2015, treatment note from Connections). ECF Doc. No. 12, Page ID# 1048, referencing Tr. 862. However, Murray does not explain how that treatment note supports Nagle-Yang's opinion. Id. In the treatment note, the therapist recorded that medication had been "helpful" and that Murray had been attending Magnolia Clubhouse twice a week for group therapy. (Tr. 862) She stated that Murray struggled with suicidal ideation but was coping by distracting herself and denied thoughts of harming herself or others. (Id.) Contrary to Murray's argument, nothing in the referenced treatment note supports the extreme limitations described by Dr. Nagle-Yang.[10]

_____

[10] A review of the other psychiatric evaluations also supports the ALJ's determination that other evidence conflicted with Dr. Nagle-Yang's assessment. Murray's medication compliance was sporadic. (Tr. 581, 583, 599, 862, 866, 883, 900) Although often exhibiting a downed mood, Murray also frequently reported an improvement in her symptoms and that she was feeling happy or okay. (Tr. 583, 595, 864,872, 886, 888, 897, 900, 910, 914, 917, 919, 922-28) Mental status examinations also consistently noted linear thought process, no delusions, cooperative behavior, intact cognition, and fair insight and judgment. (Tr. 573, 576, 579, 582-83, 595, 597, 599, 862, 864, 866, 869, 872). In addition, in December 2014, Murray's therapist encouraged her to continue looking for jobs. (Tr. 890)

Likewise, the ALJ found Dr. Kea's assessment of extreme physical limitations to be unsupported. The ALJ found that, despite Murray's complaints of disabling physical pain, only conservative care was recommended. (Tr. 25) Substantial evidence supports that determination. Providers consistently recommended only conservative treatments including NSAIDs and a home exercise program. (Tr. 347, 403, 487, 819, 836-37, 844-45) Despite several trips to the emergency room for neck and back pain, emergency treatment providers found no emergency medical condition and recommended that Murray continue the conservative plan of care. (Tr. 394, 778, 786-87, 791) Although still determining that Murray would "best be served by trial continued home exercises," Dr. Malkamaki added injections to the treatment plan upon Murray's request. (Tr. 347) However, Dr. Malkamaki ultimately discontinued the injections. He indicated that he would not consider additional injections until "she becomes a better 'passive treatment responder' by engaging in rehab" and again recommended adhering to a home exercise program. (Tr. 836-37)

In fact, despite treating with Murray since April 2012, Dr. Kea only recommend conservative treatments including pain relievers and an electric heat pad. (Tr. 334, 336, 350-51, 387, 626, 713, 779) In October 2012, Dr. Kea listed no plan to treat Murray's back or neck pain and reported that Murray did not need to return until May 2013 for a physical. (Tr. 353) Dr. Kea's examinations notes also fail to support her MSS. In support of the MSS, Murray cites an April 25, 2014, treatment note. ECF Doc. No. 12, Page ID# 1046. However, the April 25, 2014, treatment note consisted only of a summary of Murray's complaints. Dr. Kea made clear that the summary list including restrictions on sitting, standing, lifting, etc. were from Murray's self-reports. (Tr. 713) (Underneath the restrictions list Dr. Kea notes that Murray "complains of the

above.")  Thus, there is no indication that anything other than Murray's self-reports supported the extreme limitations adopted in Dr. Kea's May 2014 MSS.

The ALJ determined that Murray's self-reports were "not credible."  (Tr. 24)  Murray has not directly challenged the ALJ's credibility determination.  The ALJ found that Murray's work history suggests that her impairments are not as severe as alleged.  Murray indicated that she stopped working in August 2011 due to her disabling conditions (Tr. 207) but as the ALJ pointed out, Murray was actually laid off in August 2011 and certified that she was subsequently able to work when collecting unemployment.  (Tr. 26, 43)  Murray temporarily worked a seasonal job as a cashier in December 2013 despite her impairments.  (Tr. 26, 573)  She also admitted to actively seeking employment throughout 2014 and 2015.  (Tr. 26, 595, 886, 874, 890)

As discussed more fully above, the ALJ noted that the routine and conservative treatments belie her complaints of disabling pain.  (Id.)  The ALJ also noted that Murray's physical examinations and objective testing also failed to support more extreme physical limitations.  (Tr. 25, 332, 360, 387, 391, 425)  In addition, the ALJ relied on the opinions of the state reviewing physicians, Drs. Manos and Prosperi, and reviewing psychologists, Drs. Waggoner and Hoyle.  (Tr. 25)  The ALJ found these opinions were consistent with the preponderance of the evidence including physical examinations and psychiatric evaluations.  (Tr. 25)  "A properly balanced analysis might allow the Commissioner to ultimately defer more to the opinions of consultative doctors than to those of treating physicians."  *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 379–80 (6th Cir. 2013); Soc. Sec. Rul. No. 96–6p, 1996 WL 374180, at *3 ("In appropriate circumstances, opinions from ... psychological consultants ... may be entitled to greater weight than the opinions of treating or examining sources.").

Based on all of the above, the ALJ's determination that the opinions of Drs. Kea and Nagle-Yang lacked sufficient explanations to support their limitations and that other evidence in the record was inconsistent with the degree of limitations imposed by these doctors is supported by substantial evidence in the record. Thus, the ALJ was permitted to reject these opinions and provided an adequate statement of reasons for doing so. *Francis v. Comm'r Soc. Sec. Admin.,* 414 Fed.Appx. 802, 805 (6th Cir.2011) ("The agency's treating-source rule permits an ALJ to reject a treating source's opinion if substantial evidence in the record contradicts it.")

## 2. Consultative Examiner

Next, Murray argues that the ALJ's decision requires remand for failing to provide a "meaningful explanation of Dr. House's findings." ECF Doc. No. 12, Page ID# 1050. The consultative examiner, Dr. House, opined that due to Murray's panic attacks, stress response, and coping skills, she would likely "be dysfunctional in a work environment and would probably not show up to work." (Tr. 326) Murray argues that this opinion conflicts with the RFC providing that she could perform the mental requirements for some work activity. ECF Doc. No. 12, Page ID# 1050.

Dr. House also concluded that Murray's prognosis was "fair." (Tr. 327) He noted that, "She does receive treatment that can be adjusted if necessary." (Id.) The ALJ provided that Dr. House's comment about Murray's "fair" prognosis be given "little weight" because it was too vague to be helpful. (Tr. 25) The ALJ did not elaborate on Dr. House's opinion that Murray would likely be dysfunctional and probably not show up to work.

Notably, the Social Security Act's requirement that ALJ's give "good reasons" for the weight given to medical opinions applies only to treating sources. *Smith v. Comm'r of Soc. Sec.,* 482 F.3d 873, 875 (6th Cir.2007); *Phillips v. Comm'r of Soc. Sec.*, 972 F. Supp. 2d 1001, 1017

(N.D. Ohio 2013).  Furthermore, a determination that Murray would likely not show up to work need not be credited because it is akin to a finding that she cannot perform any work  at all and, thus, is disabled.  Such statements need not be credited because a finding of disability is reserved to the Commissioner.  *Jennings v. Colvin*, No. 2:13-CV-246, 2015 WL 64864, at *3 (E.D. Tenn. Jan. 5, 2015) ("[A] statement that a claimant 'is not a candidate for regular employment' is akin to terming a claimant 'disabled,' and that ultimate issue is reserved to the Commissioner, not the treating source.")  Therefore, the ALJ's failure to address this part of Dr. House's opinion does not constitute the incorrect application of the law or provide any basis for remand.

### 3.  New Evidence

Finally, Murray contends that new and material evidence warrants a Sentence Six remand.  A district court may, under certain circumstances, remand a case under Sentence Six of 42 USC § 405(g) for further administrative proceedings in light of new and material evidence. *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996).

> The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.

42 USC § 405(g).  A plaintiff bears the burden of demonstrating that the additional evidence is both "new" and "material" and that there is "good cause" for the failure to present this evidence to the administrative law judge.  *See Hollon ex rel. Hollon v Comm'r of Soc. Sec.*, 447 F.3d 477, 483 (6th Cir. 2006).

Murray provides two pieces of supplemental evidence:  (1) a one-sentence letter from Dr. Kea indicating that Murray's medical problems prevent her from maintaining gainful employment; and (2) a letter from Adam Brown, M.D. stating that Murray's fibromyalgia is

"causing her a large amount of stress and disability" and that Murray is "having difficulty completing her activities of daily living because of her symptoms."  (Tr. 943, 963)

### a.      Dr. Kea's 2015 Letter

Dr. Kea's 2015 letter is neither new nor material.  First, Dr. Kea's letter is not new because it is cumulative of evidence already in the record.  In fact, Dr. Kea provided an identical letter in July 2014.  (Tr. 594)  Both letters state "Ms. Murray has the following medical problems which prevent her from maintaining gainful employment" and then provides an "active problems list" as "cervical discogenic pain syndrome, myofascial pain syndrome, lumbar discogenic pain syndrome, and major depression."  (Tr. 594, 943)  The Sixth Circuit has held that "evidence [ ] largely cumulative of evidence and opinions already present in the record" need not be considered for remand.  *Longworth v. Comm'r of Soc. Sec*., 402 F.3d 591, 598 (6th Cir.2005).  "This notion holds true because a Sentence Six remand is appropriate only if the plaintiff can show new substantive evidence that might have changed the outcome of the prior proceeding[;] and if the record presently reflects the same evidence and opinions at the time of the proceeding, then it is not probable that the "new" evidence would have changed the outcome."  *Walton v. Astrue*, 773 F. Supp. 2d 742, 751 (N.D. Ohio 2011)(internal quotation and citation omitted); *Pickard v. Comm'r of Soc. Sec*., 224 F.Supp.2d 1161, 1171 (W.D.Tenn.2002) (*quoting Elliott v. Apfel*, 28 F. App'x 420, 424 (6th Cir.2002) ("New evidence must indeed be new; it cannot be cumulative of evidence already in the record.")  Second, the evidence is not material because it does not establish "a reasonable probability that the ALJ would have reached a different decision if he had considered the evidence."  *See Sizemore v. Secretary of H.H.S.,* 865 F.2d 709, 711 (6th Cir.1988).  Again, the  same letter was in the record at the time the ALJ reached his decision.  Thus, there is no probability that a second letter, identical to the first, would have caused the ALJ

to conclude differently.  Moreover, Dr. Kea's letter is also not material because she merely opines on the ultimate question of disability, an issue reserved to the Commissioner.

### b.    Dr. Brown Letter

Likewise, the letter from Adam Brown, M.D., is also not new or material for the same reasons.  Murray's fibromyalgia diagnosis is not new.  She was diagnosed with the condition prior to the ALJ's July 2015 decision.  (Tr. 938)  Thus, the cumulative diagnosis is not new. Furthermore, a diagnosis alone does not indicate the severity of an impairment.  *See Young v. Sec'y of Health and Human Servs.,* 925 F.2d 146,151 (6th Cir.1990) (diagnosis of impairment does not indicate severity of impairment); *Bradley v. Sec'y of Health and Human Servs*., 862 F.2d 1224, 1227 (6th Cir.1988) (signs of arthritis not enough; must show that condition is disabling).  Although Dr. Brown  stated that fibromyalgia caused plaintiff a large amount of stress and disability, he provided no greater insight into the nature and degree of Murray's impairment, nor did he propose any specific work restrictions.  (Tr. 963).  Additionally, Dr. Brown's determination that Murray's fibromyalgia diagnosis is causing her disability is an issue reserved to the Commissioner.  Since this evidence is not new and there is not a reasonable probability that the ALJ would have reached a different decision had he considered the evidence, Murray has not met her burden for a Sentence Six remand.

Murray has not identified any error in the ALJ's decision that reflects a mis-apprehension of the appropriate legal standards or a mis-application of those standards.

## VII. Recommendation

Murray has not demonstrated a basis upon which to reverse or remand the Commissioner's decision. Accordingly, I recommend that the final decision of the Commissioner be **AFFIRMED**, pursuant to 42 U.S.C. §405(g).

Dated: May 30, 2017

Thomas M. Parker
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may waive the right to appeal the District Court's order. See *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981). See also *Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).